UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
)
EDWIN DEJESUS AND MARIA L.              )
CARTAGENA,                               )
                                         )
            Plaintiffs                   )
                                         )        NO. 11-CV-11563-WGY
v.                                       )
                                         )
BERTSCH, INC. AND PARK                   )
CORPORATION,                             )
                                         )
            Defendants                   )
                                         )
———————————————————     )

### PLAINTIFFS' STATEMENT OF CONTESTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiffs Edwin DeJesus and Maria L. Cartagena

submit the following Statement of Contested Material Facts:

### I.   The Bertsch Business Prior to Park

1.   Bertsch & Company, Inc. was an Indiana Company formed in 1879 and

incorporated in 1911. (*See* Statement of Financial Affairs, Exhibit 2 to

Declaration of Benjamin R. Zimmermann, dated April 5, 2012 (Zimmermann

Decl.")).

2.   Bertsch was a family owned business until 1978, and operated as a wholly

owned subsidiary of Deem International, Inc. from 1978 to 1985. (*See* Nov.

21, 1984 Letter from James H. Worl to M.M.T.S. Corp., at 1, Exhibit 3 to

Zimmermann Decl.).

3.   In 1978, Deem International, Inc. purchased 80% of the shares of Bertsch

and Company, Inc. (*See* Ex. 2, Statement of Financial Affairs, at Ex. I; *see

also* Ex. 3, Letter to M.M.T.S., at 1). Bertsch was operated as a division of

Deem but remained a separate corporate entity from 1978 to 1985.  (*See* Ex. 3, Letter to M.M.T.S., at 1-2; February 23, 2012 Deposition of Terry Smith ("Smith Dep."), at 7, Exhibit 4 to Zimmermann Decl.; February 7, 2012 Affidavit of Terry Smith ("Smith Aff."), at ¶ 2, Exhibit 5 to Zimmermann Decl.).  The remaining shareholders of Bertsch (other than Deem) were James Worl, Robert Wonsetler, Norm Bond, and the Estate of John Worl, descendants of the Bertsch family, and the three living descendants continued to work for Bertsch after the Deem acquisition. (*See* Ex. 2, Statement of Financial Affairs, at Ex. I; Park Answers to Interrogatories, No. 18, Exhibit 6 to Zimmermann Decl.; *see also* Ex. 3, Letter to M.M.T.S., at 1).

4.      Bertsch operated out of Cambridge City, Indiana at 2 East Church Street. (Ex. 4, Smith Dep. at 7).

5.      From the time of its formation, Bertsch manufactured various kinds of metal bending products, but specialized in plate bending rolls, establishing itself as the premier plate bending roll manufacturer in the industry. (*See* Ex. 3, Nov. 21, Letter to M.M.T.S., at 1; September 21, 1990 Deposition of William Cook ("Cook Dep."), at 10-11, Exhibit 7 to Zimmermann Decl.; October 18, 1984 Letter from R.L. Wonsetler to Raymond Park, at 1, Exhibit 8 to Zimmermann Decl.; Feb. 12, 1986 Resume of Bertsch and Company, at 1 Exhibit 9 to Zimmermann Decl.; Memo, at 1-4, Exhibit 10 to Zimmermann Decl.). The name "Bertsch" is to bending rolls as the original company name "Refrigerator" is to the appliance formerly known as an icebox.  (*See* Ex. 7, Cook Dep. at 10-11).

6.   Each Bertsch machine bore the Bertsch name and logo, had a Bertsch

serial number M-XXXX, and a Bertsch machine file which were contained in

machine books kept in Cambridge City, Indiana. (Ex. 4, Smith Dep., at 11-

12, 27-32; Ex. 7, Cook Dep. at 10; January 26, 1993 Deposition of Caroll

Downing ("Downing Dep."), at 31, 54, Exhibit 11 to Zimmermann Decl.).

7.   The machine which caused injury to the plaintiff was a plate bending roll,

serial number 8826, manufactured by Bertsch and sold to Cambridge

Corporation of Lowell, Massachusetts in 1957, and subsequently purchased

by James Russell Engineering in 1962. (Order Form, Exhibit 12 to

Zimmermann Decl.).

## II.   Park Seeks to Acquire and Continue the Bertsch Business

8.   In October 1984 or prior, Park entered into negotiations to acquire Bertsch.

(*See* Ex. 8, Oct. 18, 1984 Letter to Raymond Park, at 1).

9.   Initially, the deal was negotiated as a stock purchase.  Bertsch wanted

$3,600,000 for 100% of the stock, and provided Park with a list of Bertsch's

assets, prospects, and liabilities, including pending product liability claims.

Park wanted the price to be $2,000,000 "debt free." (*Id.*).

10.   According to Park's Vice President William Cook, Park intended throughout

the negotiations to operate Bertsch as an ongoing company: "Before and

after the signing of the Asset Purchase Agreement, we continued to

emphasize that we were buying Bertsch as an ongoing company and that its

employees, customers, sales organization, vendors, and its good name stay

in tact because it was an important part of our purchase price." (April 1,

3

1985 Letter from William Cook to Ray Park, at 2, Exhibit 13 to Zimmermann

Decl.).

11.   To assist with this goal, Bertsch, whose financial condition had been

declining, offered its "invaluable customer base, good will, and product

name recognition" and "strong corps of management personnel that are

available to continue providing management direction and marketing

expertise."  (*See* Ex. 8, Oct. 18, 1984 Letter to Raymond Park, at 1).

12.   The $1.9 million price Park was willing to offer, however, was not enough to

both accomplish Park's stated intent of continuing Bertsch, and satisfy

Bertsch's outstanding obligations. (*See* Ex. 13, Letter to Ray Park, at 1; Ex.

8, Oct. 18, 1984 Letter to Raymond Park, at 1).

13.   Three main sources of Bertsch liabilities were at issue:  outstanding debts to

Provident Bank and Third National Bank of Tennessee (*see* April 7, 1986

Letter from Leonard Opperman to The Official Creditor's Committee of

Bertsch and Company, Inc., at 1, Exhibit 14 to Zimmermann Decl.; Ex. 13,

Letter to Ray Park, at 1; Ex. 8, Oct. 18, 1984 Letter to Raymond Park, at 1);

a union contract with the UAW that Park did not want to continue (*see*

March 28, 1985 Letter from Lance B. Johnson to Bertsch and Company,

Inc., at 2, Exhibit 15 to Zimmermann Decl.); and a number of outstanding

lawsuits involving product liability claims for defective Bertsch machines

(*see* Ex. 2, Statement of Financial Affairs, at Ex. A; Ex. 13, Letter to Ray

Park, at 1).

14.  To dispatch these liabilities and allow the deal to go forward, according to

the attorneys involved in the negotiations, "by November 10, 1984, it was

agreed and determined to be a condition of [the] Agreement and sale that

Bertsch would file for Bankruptcy Protection in a Chapter 11 proceeding . . .

Pursuant to this condition of sale, on November 13, 1984, Bertsch filed a

Chapter 11 Petition and, on November 29, 1984, Bertsch filed an

Application for Authority to Sell Real and Personal Property Free and Clear

of Liens and Encumbrances." (March 4, 1993 Wayne C. Ponader Aff. ¶¶ 5-

6, Exhibit 16 to Zimmermann Decl.; March 4, 1993 John  G. Deckard Aff. ¶¶

5-6,  Exhibit 17 to Zimmermann Decl.).  In a letter to a potential outside

buyer dated November 21, 1984, Bertsch president James Worl wrote that

"we now have an agreement with a domestic buyer. . . . In accordance with

the conditions of this agreement, on November 13, 1984, we filed for

involuntary bankruptcy under Chapter 11." (*See* Ex. 3, Letter to M.M.T.S., at

2).

15.  Park was not entirely comfortable with the bankruptcy approach due to

concerns that it might interrupt the ongoing Bertsch business but agreed to

it on the representation that "many of the outstanding claims against the

Bertsch Company would be eliminated through bankruptcy court." (*See* Ex.

13, Letter to Ray Park, at 1).

16.  Thus, the contract Bertsch and Park entered into—titled "Asset Purchase

Agreement"—stated: "It is understood that Seller will file an appropriate

petition under Chapter 11 of the Bankruptcy Code and that the purchase

5

and sale contemplated under this Agreement shall be subject to the approval and consent of the Bankruptcy Court, and the District Court. It is further understood that following the consummation of this sale, Seller will distribute all its assets to its creditors and no longer continue in business." (November 30, 1984 Asset Purchase Agreement, "Agreement", at 4, Exhibit 18 to Zimmermann Decl.).

17. Under the Agreement, in addition to all real and personal property, Park acquired Bertsch's "engineering, engineering drawings, patents, copyrights, licenses or know-how; [t]he sole and exclusive right to own and use the trade name "BERTSCH" and all other trade names, trademarks and logos heretofore owned or used by [Bertsch]; [and all] customer lists, names, addresses and contact persons." (*Id.* at 2).

18. In the course of negotiations, Bertsch also agreed to (1) assist Park in reissuing all outstanding customer orders directly by the customer to Park Corporation, and advise all customers to make payments directly to Park; (2) assist in completing orders for Bertsch customers and provide management assistance from current Bertsch employees;[1] (3) provide Park with parts, supplies, and other inventory necessary for any such orders; (4) provide copies of engineering drawings; and (5) consent to the use by Park of the trade name "Bertsch" along with all patents, copyrights, licenses, and know-how in connection with the completion of outstanding customer

---

[1] Park later reduced its purchase price from $1.9 to $1.5 million, in part because it felt that Bertsch had failed to provide adequate management assistance to allow the Bertsch business to continue smoothly during the transition. (*See* Ex. 15, Letter to Bertsch and Company, Inc., at 3).

6

orders. (*See* November 26, 1984 Letter from Bertsch & Company, Inc. to Park Corporation, at 1-2, Exhibit 19 to Zimmermann Decl.).

19.   Bertsch filed its bankruptcy petition on or about November 13, 1984. (*See* Debtor's Petition dated November 12, 1984, Exhibit 20 to Zimmermann Decl.).  After the filing, Park's counsel reiterated that to fulfill the Agreement Bertsch was to deliver a bankruptcy order that "should include a statement that as purchaser of the Bertsch facilities, with the intention of operating same as an ongoing business, Park will neither be deemed the successor of Bertsch nor ordered by . . . the Court to recognize the UAW as the bargaining agent for employees working in such plant." (Ex. 15, Letter to Bertsch and Company, Inc., at 2).

20.   Bertsch's creditors, most notably the Provident and Third National banks, withdrew objections to the bankruptcy and signed off on the transaction with Park in exchange for a secured interest in the purchase price, as did the U.A.W. Union (*See* Jan. 28, 1985 Bankruptcy Court Order, In re Bertsch & Company, Inc., at 4, Exhibit 21 to Zimmermann Decl.; *see* also Bankruptcy Case Docket, In re Bertsch & Company, Inc., entries of 1/18/85-5/3/85, Exhibit 22 to Zimmermann Decl.; Ex. 16, Ponader Aff. ¶ 4; Exhibit 17, Deckard Aff. ¶ 4).

21.   On May 3, 1985, the "debtor's application for modification of the agreement to sell real estate and personal property free and clear of liens and encumbrances" was approved by the United States Bankruptcy Court,

287864.1

Southern District of Indiana. (*See* May 3, 1985 Bankruptcy Court Order, Exhibit 23 to Zimmermann Decl.).

22.   No provision was made for the existing or future claims for those injured by Bertsch machines. (*See* April 26, 1993 Deposition of William Cook, at 79-81, Exhibit 24 to Zimmermann Decl. *See generally* Ex. 18, Agreement).

### III.   Bertsch Immediately Ceases Business

23.   As of May 3, 1985, Bertsch and Company, Inc. ceased operations pursuant to the conditions of the Agreement. (*See* Debtor's Application to Confirm Sale, filed June 26, 1985, ¶ 4,  Exhibit 25 to Zimmermann Decl.; Ex. 23, May 3, 1985 Bankruptcy Order; Ex. 18, Agreement, at 4).

24.   In June 1985, approximately six weeks after completing the transaction and receiving the purchase price from Park, Bertsch and Company, Inc. reported to the bankruptcy court that it had "effectively ceased its operations as a manufacturer or heavy industrial equipment, and has no prospect of engaging in further business operations."  (Ex. 25, Debtor's Application to Confirm Sale, ¶ 4; *see also* Ex. 22, Bankruptcy Docket, at entry dated 6/26/85).

### IV.   Park Holds Itself Out as Bertsch

25.   Within three weeks of the bankruptcy court's approval, Park V.P. Robert Zabelsky (on stationary indicating that Bertsch was still a subsidiary of Deem International) began writing to customers enclosing Bertsch and Company, Inc. catalogs and technical papers. (*See* May 22, 1985 Letter from Robert Zabelsky to Chet Bisnett Company, Exhibit 26 to Zimmermann

8

Decl.).  The Bertsch logo and letterhead remained nearly identical, with the exception of the words "a division of Park Corporation" replacing "a subsidiary of Deem International." (*Compare* Ex. 44 *with* Ex. 47).

26.  Letters were sent from prior Bertsch employees to dealers and customers indicating that "Bertsch is a part of Park Corporation and WHEMCO." (July 26, 1985 Letter from Caroll Downing to Montgomery/Peterson, Inc., Exhibit 27 to Zimmermann Decl.).  Park reached out to Bertsch customers, stating that "Bertsch and Company has been purchased by The Park Corporation." (May 23, 1985 Letter from Robert Zabelsky to Caterpillar Tractor Company, Exhibit 28 to Zimmermann Decl.).

27.  Press releases immediately following the transaction indicated that "Bertsch will operate as a part of the WHEMCO division [of Park Corporation] and maintain its broad product line." (May 31, 1985 Press Release, at 1, Exhibit 29 to Zimmermann Decl.).

28.  Letters to existing Bertsch customers indicated that "Bertsch is now a division of Park Corporation.  Production of new machines, repair parts, and complete machine rebuilds are ongoing with the same quality that has kept this company at the top of the industry for over 115 years." (*See* June 9, 1986 Letter from Mark Liebert to Ohio Valley Machinery, Exhibit 30 to Zimmermann Decl.).

29.  When former key Bertsch employees began employment with Park after the transaction, Park referred to it as their return to "Bertsch" in letters to

existing customers. (*See* Dec. 5, 1985 Letter from Robert Zabelsky to Montgomery/Peterson, Inc., Exhibit 31 to Zimmermann Decl.).

30. Park also solicited new customers, such as the British Navy, by submitting a "resume" which included Bertsch's long and reputable history, including Bertsch's supply of machines to the U.S. military in World War I and World War II. (*See* May 5, 1986 Letter from R.W. Zabelsky to Ministry of Defense, Exhibit 32 to Zimmermann Decl.; Ex. 9, Resume, at 1). In this resume, Park stated that "Bertsch and Company have been producing various types of plate fabricating machinery since its founding in 1876" and that "Bertsch and Company was incorporated in 1910 and has always been a vital supplier of their type of plate fabricating machines to the defense industry in America, both to commercial and governmental operations. . . . Today, Bertsch continues with the production of their broad line of plate bending rolls . . . ." (Ex. 9, Resume, at 1-2).

31. Park had literature drafted which expounded on the 110 years of Bertsch operations, stating that "[i]n May, 1987 [sic], Whemco, a division of the Park Corporation <u>bought Bertsch & Company</u> and all of its assets," and stating that "[t]he Bertsch name has long been recognized in the industry for outstanding quality and performance of its bending roll machines. Its 110 years of continuous operation proves its product's reliability." (Ex. 10, Memo, at 5) (Emphasis added).

32. Park issued standard form advertisements addressed to "Bertsch User," indicating that Bertsch was ongoing and that "Bertsch looks forward to

working with you as we have over the past 115 years with thousands – from the smallest job shops to the largest corporations." ("Bertsch User" Advertisement, Exhibit 33 to Zimmermann Decl.). These form letters ended with the phrase "Contact us…….TODAY!" (*Id.*) This same language was used in a "Bertsch Bulletin" issued on June 6, 1986. (Bertsch Bulletin, Exhibit 34 to Zimmermann Decl.).

33. At the first documented trade show after the transaction, Bertsch sent six employees to represent the company. (Ex. 4, Smith Dep. at 24-26; "Work Schedule for Trade Fair", Exhibit 35 to Zimmermann Decl.).  The purpose of attending the show was "just to show everybody that Bertsch was alive and was continuing business." (Ex. 4, Smith Dep. at 25). Every employee representing the company at the trade show—James Spurling, Terry Smith, Mike Fink, Rod Longnecker, James Worl, and Mark Liebert—had worked for Bertsch before the transaction with Park, and most of them had been fixtures in the company for years and even generations. (*Id.* at 25-26; Ex. 35, "Work Schedule for Trade Fair").

**V.   Park Continues the Operations of Bertsch Uninterrupted**

34. Before the transaction, Bertsch was divided into four main departments: engineering, service, sales, and manufacturing. (Ex. 4, Smith Dep. at 12). All four departments were located at 2 East Church Street, Cambridge City, Indiana prior to the transaction. (*Id.* at 11-12).

287864.1

35.   Following the Park transaction, the management of sales, service, and engineering remained in the same facility in Cambridge City. (Ex. 4, Smith Dep. at 12-13; Ex. 5, Smith Aff. ¶¶ 5, 8-9).

36.   Manufacturing operations were moved to Pennsylvania until approximately 1993, when they returned to Cambridge City using the same assembly process as before the transaction. (*See* Ex. 5, Smith Aff. ¶¶ 11-12; Ex. 4, Smith Dep. at 44).  Park advertised the manufacturing move as a move by "the Bertsch Co., in order to better serve its growing domestic and international markets for quality bending rolls, angle rolls, press brakes and shears." (*See* Oct. 21, 1985 Auction newsletter, Exhibit 36 to Zimmermann Decl.). Park auctioned the machinery and equipment it deemed "surplus to the continuing needs of BERTSCH in its new and expanded facilities." (*See id.*).

37.   Bertsch continued to design and manufacture the same products using the Bertsch name and with the Bertsch logo attached. (*See* Ex. 7, Cook Dep. at 10; Ex. 5, Smith Aff. at ¶¶ 6-8; *see also* Ex. 4, Smith Dep. at 11-12, 23, 66-67; Ex. 11, Downing Dep., at 31, 53-54).  The signature bending roll, from the smallest size 6 plate bending roll to the largest size 40, remained available for production.  (Ex. 4, Smith Dep. at 30; Ex. 9, Resume, at 1-2).

38.   The process for creating new Bertsch machines remained the same. Customer orders were received, and all machines were numbered, documented, and engineered using the same process as before the

287864.1

transaction, including the use of the same Bertsch engineering drawings.

(*See* Ex. 4, Smith Dep. at 11-12, 26-27, 31, 66-67; Smith Aff. ¶¶ 5-7).

39. Following the transaction with Park, the Bertsch phone numbers stayed the same and phones were still answered "Thank you for calling Bertsch." (Ex. 4, Smith Dep. at 24).

40. Design and engineering of Bertsch machines remained in Cambridge City using the same employees as before the transaction. (Ex. 5, Smith Aff. ¶¶ 5-6, 8).  Other than adding one employee to the engineering department, there were no other changes to that department after the transaction:

> Q.   Were there any other changes to the engineering department after Park's purchase of assets besides having an employee in the engineering department based out of West Homestead?
>
> A.   No, sir.

(Ex. 4, Smith Dep. at 63).

41. Chuck Schaffold, the one employee Park asserts was added to the department, "wasn't designing bending rolls" and "was working mostly on steel mill repairs and that type of thing." (Ex. 4, Smith Dep. at 63).

**VI.   The Management and Key Employees in Cambridge City Remained the Same.**

42. Before the transaction with Park, the senior employees in the Bertsch engineering department were Robert Wonsetler, Terry Smith, and Mike Fink. (Ex. 4, Smith Dep. at 13-14). Following the Park transaction, Terry Smith and Mike Fink continued to manage the engineering department out of Cambridge City. (Ex. 5, Smith Aff. ¶ 8). Terry Smith's resume indicates

that he was employed by "Bertsch & Co." from February, 1970 through September, 2011. (Ex. 4, Smith Dep. at Ex. 5).

43. Gary Ventress and Deb Weilenman managed the Sales Department under former president James Worl prior to the Park transaction, and continued to manage the Sales Department after the transaction. (Ex. 5, Smith Aff. ¶ 8).

44. The Service Department was managed by Carroll Downing both before and after the Park transaction. (Ex. 4, Smith Dep. at 15-16).

45. In addition to these management personnel, other long-time employees also stayed on, including two of three living Bertsch family shareholders at the time of the transaction, James Worl and Norm Bond. (*See id.* at 16-20; Ex. 2, Statement of Financial Affairs, at Ex. I; Ex. 6, Park Answers to Interrogatories, No. 18).  Terry Smith's resume indicates that he was employed as a "design engineer" for "Bertsch & Co." from February, 1970 through September, 2011. (Ex. 4, Smith Dep. at Ex. 5).

**VII.** **Bertsch Products Remained the Same After the Transaction.**

46. In the years leading up to the Park transaction, Bertsch manufactured four product lines: "shears, press brakes, angle rolls and plate bending rolls." (Ex. 5, Smith Aff. ¶ 7).

47. In the early 1980s, sometime before the Park transaction, Bertsch discontinued the manufacturing of shears and press brakes and also changed its bending roll engineering from a three roll to a four roll design, leaving the remaining product lines at the time of the transaction angle rolls and plate bending rolls. (*See id.*).

14

48.   Park advertised that it was continuing the production of plate bending rolls, angle rolls, shears, and press brakes, the four product lines of Bertsch and Company, Inc. prior to the transaction. (*See* Ex. 29, Press Release, at 1; Ex. 36, Auction newsletter).

49.   When looking at a list of plate bending rolls made by Bertsch, Bertsch employee of forty-one years Terry Smith indicated that he could not tell which were made before or after the transaction. (*See* Ex. 4, Smith Dep. at 34-35).

50.   Years later, Park changed the numbering of some of the machines, but "the machines themselves stayed pretty much the same."  (*Id.* at 68).

## VIII.   Park's Handling of Liabilities in the Agreement

51.   The Agreement states, at paragraph 1(c), that "Except as hereinafter expressly undertaken in paragraph 3 hereof, Buyer is not purchasing or undertaking the assumption of any of the liabilities of Seller." (Ex. 18, Agreement, at 3). However, the exceptions that were clearly intended are not to be found in the referenced paragraph 3.  (*See id.* at 4).

52.   Paragraph 3 states "It is understood that Seller will file an appropriate petition under Chapter 11 of the Bankruptcy Code and that the purchase and sale contemplated under this Agreement shall be subject to the approval and consent of the Bankruptcy Court, and the District Court. It is further understood that following the consummation of this sale, Seller will distribute all its assets to its creditors and no longer continue in business." (*Id.*).

287864.1

53. Paragraph 4 of the Agreement, titled "Limitation of Liabilities," states as follows: "Seller hereby agrees to indemnify, defend and save harmless Buyer from and against all of Seller's liabilities incurred prior to or after the date of closing and all product liability for personal injury whenever a claim may arise with respect to all products shipped on or prior to the date of closing. Buyer specifically assumes and indemnifies Seller with respect to claims, if any, arising with respect to products shipped by Buyer under the Bertsch name after the date of closing. Buyer is not assuming any liability or responsibility for damages, repairs, returned merchandise or any consequential damages which said customers may have sustained in connection with said product warranty claims." (*Id.* at 5).

54. Said "warranty claims" and said "customers" in paragraph 4 of the agreement are undefined. (*See id.*).

## IX.   Park Assumes Liabilities of Bertsch

55. A few months after the bankruptcy order, Raymond Park, President of Park Corporation, signed and submitted a Novation Agreement to the United States Government in which Park was recognized as Bertsch & Company, Inc.'s "successor in interest in and to the contracts" between Bertsch and the government. (August 30, 1985 Novation Agreement, at 2, Exhibit 37 to Zimmermann Decl.; *see* Letter from Vernon J. Zielinski to James L. Concannon, Exhibit 38 to Zimmermann Decl.).

56. Park stated to the government that in the transaction with Bertsch, Park had "assumed all obligations and liabilities of Bertsch and Company, Inc. under

16

the contracts by virtue of the above transfer [pursuant to the Asset Purchase Agreement]"; had "acquired all the operating assets of Bertsch and Company, Inc." and was "in a position to fully perform all obligations that may exist under the contracts." (Ex. 37, Novation Agreement, at 2).  These contracts were not mentioned in the Agreement.  (Ex. 18, Agreement).

57.   After the transaction and bankruptcy order, outstanding repair orders for Bertsch machines manufactured prior to the bankruptcy filing were treated and priced as "warranty" items to be provided by Park. (*See* May 7, 1985 document entitled "Outstanding Repair Orders", Exhibit 39 to Zimmermann Decl.).

58.   When called upon to provide service and parts pursuant to Bertsch's pre-transaction warranties made by Bertsch, Park's attorneys—after Bertsch filed for bankruptcy and before the bankruptcy order—counseled against providing parts and services under such warranties, telling Park that it must insist on "cash in advance or C.O.D." payments.  After the bankruptcy order, however, Park began providing parts and services under those same warranties:  costs and expenses were "waived", and service charges were "absorbed" by Park. (*See* Dec. 30, 1985 Memo, Exhibit 40 to Zimmermann Decl., at 2-3).

59.   Both before and after the transaction, Park assumed Bertsch's liabilities under backlogged purchase orders, and was "in the process of starting to manufacture most of [Bertsch's] current machines in backlog" before the date of the Agreement. (*See* Ex. 3, Letter to M.M.T.S., at 3).

287864.1

60. Immediately after the bankruptcy order, Park sent letters to customers asking that their purchase orders to Bertsch be re-issued to Park or WHEMCO. (*See, e.g.*, May 22, 1985 Letter from Robert Zabelsky to Montgomery/Peterson, Inc., Exhibit 41 to Zimmermann Decl.).

61. Park also requested that outstanding invoices be re-submitted to Park or WHEMCO so that they could be honored. (*See, e.g.*, June 10, 1985 Letter from Robert Zabelsky to Society of Manufacturing Engineers, Exhibit 42 to Zimmermann Decl.; November 9, 1984 Letter from R.L. Wonsetler to Soceity of Manufacturing Engineers, Exhibit 43 to Zimmermann Decl.; February 4, ,1985 Letter from Howard H. Deem to Society of Manufacturing Engineers, Exhibit 43 to Zimmermann Decl.).

62. Exclusive distributor contracts for Bertsch dealers and "the Park Corporation, doing business as Bertsch" were also renewed immediately following the approval of the transaction. (*See, e.g.*, Ex. 27, Letter to Montgomery/Peterson and attached "Sales Representative Agreement"; July 26, 1985 Letter from Caroll Downing to Machines for Industry, Inc. and attached "Sales Representative Agreement", Exhibit 45 to Zimmermann Decl.).

63. Park assumed Bertsch's ongoing obligations under its vendor agreements. Within a week of the bankruptcy order, Mr. Zabelsky issued a "Letter of Intent" expressly assuming Bertsch's obligations: "[A]ll shipments made by Bertsch and Company, Inc. shall be paid within the 15 day time period as

18

required by Federal Express." (May 8, 1985 Letter from Robert Zabelsky to Federal Express, Exhibit 46 to Zimmermann Decl.).

64. Similar letters were issued to companies like UPS, "resetting" Bertsch's accounts. (Oct. 11, 1985 Letter from Deborah Weilenman to United Parcel Service, Exhibit 47 to Zimmermann Decl.).

## X.   Park Denies Liability for Bertsch Products

65. In a series of cases, in a number of jurisdictions under variations of corporate successor liability law, Park—through its insurer—has litigated the issue of its tort liability as successor to Bertsch for injuries on Bertsch machines. *See, e.g.*, *Dillman v. Indiana Rolls*, No. 2001-C-1963, 67 Pa. D. & C. 4th 294 (Lehigh Cnty. Apr. 21, 2004); *Rhodes v. C.M. Wood Machinery, Inc.*, No. 3:CV-91-1601 (M.D. Pa.  Apr. 5, 1994); *Seeley v. Park Corp.*, No. 90-5625, 1991 U.S. Dist. LEXIS 4692 (E.D. Pa. Apr. 8, 1991); *Sweatland v. Park Corp.*, 181 A.D.2d 243 (N.Y.A.D. 1992); *Cutillo v. Park Corp.*, 185 A.D.2d 641 (N.Y.A.D. 1992); *Middleton v. Park Corp.*, 99-CV-2206 (N.D.N.Y. Feb. 14, 2003). (*See* Prior Rulings, Exhibit 47 to Zimmermann Decl.).

66. With only two exceptions in the materials produced by Park,[2] Park's motions for summary judgment on the issue of successor liability have been denied: either on grounds that the factual circumstances of the Park transaction

---

[2] *Jefferson v. Bertsch*, No. 96-3676, 1997 U.S. App. LEXIS 23250 (7th Cir. Apr. 29, 1997) (plaintiff did not address issues of successor liability in case involving default judgment in another jurisdiction).  *Watson v. Bertsch & Co.*, No. A-82, 698 (D. Tex. Sept. 17, 1990) (no reasoning provided in support of court order, where Texas legislation significantly limited the application of de facto merger exception) (*See* Ex. 48, Prior Litigation).

warrant finding that Park is the successor to Bertsch and Company, Inc. as a matter of law[3]; or that Park is not entitled to summary judgment due to the material facts in dispute regarding the elements of successor liability.[4]

67.   Park carries insurance for the loss in this and other cases. (*See* Ex. 24, Cook Dep. at 79- 81; Park's Initial Disclosures, Ex. 49).

## XI.   Plaintiffs' Response to Defendant's Statement of Uncontested Material Facts.

Incorporating by reference the above evidence, plaintiff responds individually to defendant's statement as follows:

1.   The allegedly defective machine was a plate bending roll machine bearing serial number 8826 (the "Machine"), which was manufactured by Bertsch & Company, Inc. ("Bertsch") in 1957 for Cambridge Corporation of Lowell, Massachusetts. (*See* Order Form, annexed as Exhibit A to Declaration of Bradley J. Kitlowski, dated March 15, 2012 ("Kitlowski Decl.").)

**Plaintiffs' Response**:  Not disputed.

2.   Bertsch's operations were based in Cambridge City, Indiana. (*See* May 8, 1991 Deposition of Robert Wonsetler ("Wonsetler Dep."), at 38, annexed as Exhibit B to Kitlowski Decl.)

**Plaintiffs' Response**:  Not Disputed.

3.   In 1962, James Russell Engineering Works Inc. purchased the Machine from Cambridge Corporation. (*See* Order Form).

**Plaintiffs' Response**:  Not Disputed.

4.   In 1978, Bertsch was acquired by Deem International ("Deem"). (Wonsetler Dep. at 8.)

**Plaintiffs' Response**:  Not Disputed.

---

[3] *Dillman v. Indiana Rolls*, No. 2001-C-1963, 67 Pa. D. & C. 4th 294 (Lehigh Cnty. Apr. 21, 2004); *Rhodes v. C.M. Wood Machinery, Inc.*, No. 3:CV-91-1601 (M.D. Pa.  Apr. 5, 1994); *Seeley v. Park Corporation*, No. 90-5625, 1991 U.S. Dist. LEXIS 4692 (E.D. Pa. Apr. 8, 1991).
[4] *Middleton v. Park Corp.*, 99-CV-2206 (N.D.N.Y. Feb. 14, 2003); *Sweatland v. Park Corp.,* 181 A.D.2d 243 (N.Y.A.D. 1992); *Cutillo v. Park Corp.*, 185 A.D.2d 641 (N.Y.A.D. 1992).

5.      The transaction between Bertsch and Deem was structured so that the owners ofBertsch, who were all members of the same family, received either stock of Deem or notes (Wonsetler Dep. at 132-33.)

   **Plaintiffs' Response**: Disputed.  The testimony cited by Defendant does not support the statement. Robert Wonsetler did not recall the specifics of the transaction, whether it was listed as a stock sale of asset-based sale, and testified only that the owners of Bertsch "set up a payment schedule and took notes for their stock." (Wonsetler Dep. at 133, Exhibit B to Kitlowki Decl.).  In any event, the ownership following the transaction was as 80% Deem, and the rest owned by Bertsch family members, as stated in Pl.'s Statement ¶ 3.

6.      Robert Wonsetler ("Wonsetler") was a five percent owner of Bertsch at that time, and he received a stockholder interest in Deem as a result of the transaction between Bertsch and Deem. (Wonsetler Dep. at 17, 132-33.)

   **Plaintiffs' Response:**  Not disputed.

7.      Around the time of the acquisition with Deem, Bertsch's line of products expanded to include not only bending roll machines but other machines such as shearing applications and press applications. (Wonsetler Dep. at 8-9, 12-13, 16-17; *see* May 11, 1989 Deposition of Robert W. Zabelsky ("Zabelsky Dep."), at 18-21, annexed as Exhibit C to Kitlowski Decl.)

   **Plaintiffs' Response:**  Not Disputed.

8.      Beginning in approximately the early 1980s, Bertsch started to suffer financially. (Wonsetler Dep. at 13; April 26, 1993 Deposition of William Cook ("4/26/1993 Cook Dep."), at 32, annexed as Exhibit D to Kitlowski Decl.)

   **Plaintiffs' Response:**  Not Disputed.

9.      Given the financial troubles that began in the early 1980s, Bertsch attempted to find a suitor for the corporation before resorting to bankruptcy, but it could not find a "white  knight." (Wonsetler Dep. at 36.)

   **Plaintiffs' Response:**  Disputed.  The cited testimony does not support the statement.  Mr. Wonsetler testified that his team "began to find a suitor for the company prior to the bankruptcy.  And then as a white knight didn't appear it was just the representatives and the, in the proceeds with the Park acquisition study." (Wonsetler Dep. at 36).  In other words, the suitor was sought as an alternative to "the bankruptcy" contemplated by "the Park acquisition study".  The evidence is that by November 10, 1984, Bertsch's bankruptcy filing had already been made a condition to the deal with Park.  (See Pl.'s Statement ¶¶ 8-14).

10.   Bertsch filed a petition in bankruptcy under Chapter 11 on November 13, 1984. (Debtor's November 13, 1984 Bankruptcy Petition, annexed as Exhibit E to Kitlowski Decl.)

**Plaintiffs' Response:**  Not disputed.

11.   On November 30, 1984, Bertsch and Park entered an Asset Purchase Agreement ("Purchase Agreement"). (Purchase Agreement, annexed as Exhibit F to Kitlowski Decl.)

**Plaintiffs' Response:**  Disputed. While the Agreement was apparently executed November 30, 1984, the parties had already agreed to the terms and conditions of the Agreement, including the condition of involuntary bankruptcy, during negotiations prior to that date. (*See id.* ¶¶ 8-16, 19).

12.   Despite Bertsch's earlier filing of the bankruptcy petition on November 13, 1984, the Purchase Agreement provided that that the "parties understood that Seller will file an appropriate petition under Chapter 11 of the Bankruptcy Code" and that the parties "understood that following the consummation of this sale, Seller will distribute all of its assets to its creditors and no longer continue in business." (Purchase Agreement ¶ 3.)

**Plaintiffs' Response.**  Disputed. While the Defendant's quotes from the Agreement are partially correct, negotiations between Bertsch and Park, which included the condition of bankruptcy, occurred in October or earlier, before the filing of bankruptcy on November 13, 1984. Thus, the Agreement's language was not "despite" the prior bankruptcy filing, but reflected the parties' agreement that Bertsch would file for bankruptcy and cease business.  (*See id.* ¶¶ 8-16).

13.   The Purchase Agreement did not require Bertsch to initiate the bankruptcy proceeding, but merely reflected the understanding of the parties about Bertsch's intent to file for bankruptcy. (*See* September 21, 1990 Deposition of William Cook ("9/21/1990 Cook Dep."), at 19, annexed as Exhibit L to Kitlowski Decl.)

**Plaintiffs' Response:**  Disputed.  The cited testimony does not discuss what the Agreement does or does not require.  The plain language of the Agreement states that Bertsch "*will* file an appropriate petition under Chapter 11 of the Bankruptcy Code," (Ex. 18, Agreement, at 3) (emphasis added), and those involved in the deal, including Bertsch attorneys and Bertsch shareholders, understood and expressed this. (*See id.* ¶¶ 14-16).

14.   In contrast, the Purchase Agreement required Bertsch to file petitions with the bankruptcy court related to the approval of the sale of its assets. (Purchase Agreement ¶ 3.)

**Plaintiffs' Response:**  Disputed.  There is no "contrast." The Agreement both required the filing of the bankruptcy and the petitions referenced therein.  (*See id.* ¶¶ 12-16, 19).

15.    Bertsch was insolvent prior to initiating the bankruptcy proceeding, and the decisions to initiate that proceeding and to eventually dissolve the corporation were made by management and owners of Bertsch and were not caused by the Purchase Agreement. (March 14, 2012 Declaration of Robert W. Zabelsky ("Zabelsky Decl.") ¶¶ 6, 10, annexed as Exhibit M to Kitlowski Decl.)

**Plaintiffs' Response:**  Disputed. First, this testimony of Robert Zabelsky, an officer of Park, as to the "cause" of the bankruptcy filing or the state of mind of Bertsch management, should be stricken as lay opinion without foundation.  In any event, as set forth above, there is evidence, including the Agreement itself, that the bankruptcy filing was a condition of the transaction. (*See id.* ¶¶ 12-16).

16.    On January 28, 1985, the bankruptcy court authorized a sale of Bertsch assets to Park free of liability according to the terms of the Purchase Agreement. (January 28, 1985 Bankruptcy Court Order Approving Sale, annexed as Exhibit G to Kitlowski Decl.)

**Plaintiffs' Response:**  Disputed. The bankruptcy court approved an application for the sale of Bertsch's "real and personal property free and clear of liens and encumbrances."  "Free of liability" does not appear in the application or the order. The order states that "Debtor shall proceed with the sale . . . pursuant to the terms and conditions of the Asset Purchase Agreement by and between the Debtor and Park Corporation." (*See* Ex. G to Kitlowski Decl.).  What liabilities were or were not assumed pursuant to the agreement are disputed and not addressed by the order.  (*See* Pl.'s Statement ¶¶ 13-14; 51-65).

17.    On February 11, 1985, the District Court approved in all respects the bankruptcy court's order regarding the sale of Bertsch assets to Park free of liability according to the terms of the Purchase Agreement. (February 11, 1985 District Court Order Approving Sale, annexed as Exhibit H to Kitlowski Decl.)

**Plaintiffs' Response:**  Disputed. On February 11, 1985, the District Court approved "the United States Bankruptcy Court's Order, dated January 28, 1985," which authorized the sale pursuant to the terms and conditions of the Agreement. "Free of liability" does not appear in the order. (*See* Ex. H to Kitlowski Decl.). *See* Response to ¶ 16 *supra.*

18.    Bertsch and Park later modified the Purchase Agreement, reducing the purchase price from $1.9 million to $1.5 million because there were issues with title to real property. (April 16, 1985 Agreement, annexed as Exhibit I to Kitlowski Decl.; *see* 4/26/1993 Cook Dep. at 12-13, 28).

**Plaintiffs' Response:** Disputed. Bertsch and Park reduced the purchase price from $1.9 million to $1.5 million due to a list of grievances from Park, including that Bertsch had failed to provide adequate management assistance during the transition. (*See* Pl.'s Statement ¶ 18, n.1).

19.   On May 3, 1985, the bankruptcy court approved the modification to the PurchaseAgreement. (May 3, 1985 Bankruptcy Court Order Approving Sale, annexed as Exhibit J to Kitlowski Decl.)

**Plaintiffs' Response:** Not disputed.

20.   No ownership interests were exchanged in the transaction between Bertsch and Park. (*See* Wonsetler Dep. 33-34; 4/26/1993 Cook Dep. at 14.)

**Plaintiffs' Response:** Disputed. Ownership interests in every part of the Bertsch business were exchanged in the transaction, allowing Park to continue the business with the same departments and management in the same location, with the same products as before the transaction. (*See* Pl.'s Statement ¶¶ 35-50). To the extent this refers to an exchange of stock, it is not disputed that there was no exchange of stock because Bertsch declared bankruptcy as a condition to the Agreement and its stock was by definition worthless. (*See id.* ¶¶ 16, 19-21).

21.   None of the directors or officers of Bertsch became directors or officers of Park. (*See* 4/26/1993 Cook Dep. at 16; February 23, 2012 Deposition of Terry Smith ("Smith Dep."), at 63-64, annexed as Exhibit O to Kitlowski Decl.)

**Plaintiffs' Response:** Not disputed.

22.   Bertsch continued to exist until 1988, thus surviving the sale of assets as a distinct corporate entity for over three years. (*See* May 3, 1988 Bankruptcy Court Order Confirming Plan of Liquidation, annexed as Exhibit K to Kitlowski Decl.)

**Plaintiffs' Response:** Disputed. It was a condition of the Agreement that Bertsch "no longer continue in business," Bertsch completely ceased operations as of May 3, 1985, and on June 26, 1985, Bertsch reported to the bankruptcy court that it had "effectively ceased its operations as a manufacturer or heavy industrial equipment, and has no prospect of engaging in further business operations." (*See* Pl.'s Statement ¶¶ 16, 23-24).

23.   The Purchase Agreement provided in part: "[Park] is not purchasing or undertaking the assumption of any liabilities of [Bertsch]." (Purchase Agreement ¶ 1(c).)

**Plaintiffs' Response:** Disputed. This is an incomplete and therefore inaccurate recitation of the provision at issue, which reads: "Except as hereinafter expressly

undertaken in paragraph 3 hereof, Buyer is not purchasing or undertaking the assumption of any of the liabilities of Seller." (Ex. 18, Agreement, at 3). Paragraph 3, however, contains no discussion of liabilities at all, but merely recites that Bertsch will file for bankruptcy and cease business. (*See id.* at 4-5; *see also* Pl.'s Statement ¶¶ 51-54).

24.   The Purchase Agreement also provided in part:

[Bertsch] hereby agrees to indemnify, defend and save harmless [Park] from and against all of [Bertsch's] liabilities incurred prior to or after the date of closing and all product liability for personal injury whenever a claim may arise with respect to all products shipped on or prior to the date of closing. [Park] specifically assumes and indemnifies [Bertsch] with respect to claims, if any, arising with respect to products shipped by [Park] under the Bertsch name after the date of closing. [Park] is not assuming any liability or responsibility for damages, repairs, returned merchandise or any consequential damages which said customers may have sustained in connection with said product warranty claims. (Purchase Agreement ¶ 4.)

**Plaintiffs' Response:** Not disputed that this is an accurate partial excerpt.

25.   Park's business at the time of the purchase of Bertsch assets included customizing and manufacturing industrial machinery equipment. (*See* Zabelsky Dep. at 7-8; 4/26/1993 Cook Dep. at 29-30; 9/21/1990 Cook Dep. at 2-3; Zabelsky Decl. ¶ 2.)

**Plaintiffs' Response:** Not disputed except as to the characterization of the transaction as a "purchase of assets."

26.   After the transfer of assets from Bertsch, Park established a division known as "Bertsch, a Division of Park Corp." (4/26/1993 Cook Dep. at 7; *see* Zabelsky Dep. at 11-12.)

**Plaintiffs' Response:** Not disputed except as to the characterization of the transaction as a "purchase of assets."

27.   After Park purchased assets from Bertsch, Park manufactured hydraulic plate bending roll machines and hydraulic angle bending roll machines and labeled them with the Bertsch trade name. (Zabelsky Dep. at 21-22; Zabelsky Decl. ¶ 11).

**Plaintiffs' Response:** Not disputed except as to the characterization of the transaction as a "purchase of assets."

28.   After Park purchased assets from Bertsch, Park did not manufacture shears or

25

press brakes, but purchased shears and press brakes from other manufacturers and labeled them  with the Bertsch trade name. (Zabelsky Dep. at 21-22; Zabelsky Decl. ¶ 11).

**Plaintiffs' Response:**  Disputed as to the characterization of the transaction as a "purchase of assets."  Disputed that Park discontinued the manufacture of shears and brakes after the transaction as there is evidence that Bertsch discontinued its manufacturing of shears and press brakes before the transaction with Park. (*See* Pl.'s Statement ¶ 47). Not disputed that Park advertised and provided the same product lines pre-transaction as it did post-transaction, or that Park purchased shears and brakes from others and labeled them with the Bertsch trade name. (*See* Pl.'s Statement ¶¶ 46-50).

29.    The purchase, marketing, and sale of shears and press brakes by Park was not economically viable, and after a few months Park ceased to purchase, market, and sell shears and press brakes. (Zabelsky Decl. ¶ 11.)

**Plaintiffs' Response:**  Not disputed.

30.    After Park purchased assets from Bertsch, besides bending roll machines, shears, and press brakes, Park discontinued other product lines that Bertsch manufactured, including welding positioners. (Zabelsky Dep. at 21-22; Zabelsky Decl. ¶ 11.)

**Plaintiffs' Response:**  Disputed as to the "purchase of assets."  Disputed that welding positioners were a "product line" of Bertsch, and disputed that there were "other product lines" of Bertsch besides plate bending rolls, angle rolls, shears, and press brakes. (*See id.* ¶ 46). The evidence produced indicates that Bertsch manufactured and sold two main product lines—plate bending rolls and angle rolls—immediately before the Park transaction, and Park continued to manufacture and sell the same two product lines following the transaction. (*See id.* ¶¶ 46-50).  Park also advertised and may have continued selling, if not manufacturing, Bertsch's other two pre-transaction product lines, press brakes and shears.  (*Id.* ¶ 48*).

31.    Park manufactured and sold replacement parts for machines manufactured by Bertsch. (9/21/1990 Cook Dep. at 10; August 23, 2002 Deposition of Tillford Carroll Downing ("Downing Dep."), at 31-33, 36-37, annexed as Exhibit N to Kitlowski Decl.)

**Plaintiffs' Response:**  Not disputed.

32.    Park situated a portion of the Bertsch Division's sales, service, and engineering operations in Cambridge City, Indiana. (*See* 4/26/1993 Cook Dep. at 7; Zabelsky Dep. at 9-10, 41-42.)

**Plaintiffs' Response:** Disputed. The sales, service, and engineering departments were ongoing at the same location in Cambridge City before and after the transaction. Design and engineering of Bertsch machines remained in Cambridge City using the same employees as before the transaction, and the management of sales, engineering, and service all remained in Cambridge City under the same management as before the transaction. (*See* Pl.'s Statement, ¶¶ 35, 40, 42-44).

33. Two-thirds of the Bertsch Division's sales business and one-half of the Bertsch Division's service business was done from that location. (*See* Zabelsky Dep. at 41-42.)

    **Plaintiffs' Response:** Disputed. The sales and service continued to operate out of Cambridge City before and after the transaction, under the same management, and customers would continue to contact these departments in Cambridge City. (*See* Ex. 5, Smith Aff. ¶¶ 9, 11; *see* Pl.'s Statement ¶¶ 35, 43-44).

34. Park moved the Bertsch Division's purchasing and accounting and all inventory to West Homestead, Pennsylvania. (Zabelsky Dep. at 42-43.)

    **Plaintiffs' Response:**  Not disputed.

35. Park moved the manufacturing operations for the Bertsch Division to West Homestead. (Zabelsky Dep. at 10-11; Downing Dep. at 25.)

    **Plaintiffs' Response:**  Not disputed, except that the manufacturing operations returned to Cambridge City in 1993. (*See* Pl.'s Statement ¶ 36).

36. Only about one dozen employees worked for Park at the Cambridge City location. (*See* Zabelsky Dep. at 9-10.)

    **Plaintiffs' Response:** Disputed as to the word "only", as the evidence as to how many employees were at the Cambridge City location prior to the transaction is unclear.  (*See* paragraph 49 *infra).*  What is clear is that the employees who remained in Cambridge City included the key employees of Bertsch, including management personnel for three of four departments and other long-time employees. (*See* Pl.'s Statement ¶¶ 42-45).

37. Park employed two engineers in Cambridge City, and employed one engineer, Chuck Schaffold, in West Homestead, and the engineering department in Cambridge City did not supervise the engineering operations in West Homestead. (Zabelsky Dep. at 50-51; Smith Dep. at 45-46.)

    **Plaintiffs' Response:**  Disputed. Chuck Schaffold, the one engineer Park asserts was in Pennsylvania, "wasn't designing bending rolls" and "was working

27

mostly on steel mill repairs and that type of thing." (Ex. 4, Smith Dep. at 63; *see* Pl.'s Statement ¶¶ 40-42).   Mr. Smith testified that other than Mr. Schaffold being in the engineering department in Pittsburgh, there were no other changes in that department. (Ex. 4, Smith Dep. at 63).

38.     Park never operated out of Bertsch's Cambridge City production facilities. (4/26/1993 Cook Dep. at 27, 71.)

   **Plaintiffs' Response:** Disputed.  As stated above, the engineering, sales and service departments remained at the same Cambridge City facility with the same address, managers, and telephone numbers.  Park moved its production facilities to "to better serve [Bertsch's] growing domestic and international markets for quality bending rolls, angle rolls, press brakes and shears." (*See* Pl.'s Statement ¶ 36).

39.     Park sold most of the real property it acquired through the asset purchase, including the Bertsch production plant. (*See* 4/26/1993 Cook Dep. at 21-22; Zabelsky Dep. at 43; 9/21/1990 Cook Dep. at 7.)

   **Plaintiffs' Response:**  Not disputed.

40.     Park sold machinery and equipment it had acquired from Bertsch in an auction to third parties. (*See* 4/26/1993 Cook Dep. at 22; Zabelsky Dep. at 27-28; 9/21/1990 Cook Dep. at 7.)

   **Plaintiffs' Response:**  Not disputed insofar as Park auctioned the machinery and equipment "surplus to the continuing needs of BERTSCH in its new and expanded facilities." (*See* Pl.'s Statement ¶ 36).

41.     In the early 1990s, Park altered the manufacturing operations with respect to Bertsch-labeled machines by purchasing from third parties the component parts for Bertsch labeled machines, as opposed to manufacturing those parts on its own. With the parts Park purchased from third parties, it assembled the machines. (Zabelsky Decl. ¶ 12; *see* Smith Dep. at 56, 58-59.)

   **Plaintiffs' Response:**  Not disputed.

42.     In the mid 1990s, Park moved the assembly operations to Cambridge City, but Park did not use Bertsch's former production plant because that plant was sold shortly after the asset sale and purchase. (Zabelsky Decl. ¶ 12; *see* Smith Dep. at 56, 58-59.)

   **Plaintiffs' Response:**  Disputed as to the characterization of the transaction as an "asset sale and purchase."

28

43. Pursuant to the Purchase Agreement, Park used the "Bertsch" name and logo onproducts and in brochures and advertising literature. (4/26/1993 Cook Dep. at 24, 49, 65-66; 9/21/1990 Cook Dep. at 10, 21; Zabelsky Dep. at 29-30, 62; Downing Dep. at 31.)

**Plaintiffs' Response:**  Not disputed that Park did this, but dispute that this was done solely pursuant to the Agreement, as opposed to Park's stated intent to operate Bertsch as an ongoing business. (*See* Pl.'s Statement ¶¶ 10-11). Park entered into side agreements with Bertsch regarding the continued use of the Bertsch name and logo for purposes of continuing Bertsch as an "ongoing business." (*See* Pl.'s Statement ¶ 18; Ex. 13, Letter to Ray Park, at 1; Ex. 8, October 18, 1984 Letter to Raymond Park, at 1).

44. Park took possession of Bertsch's engineering list, customer lists, correspondence folders, and engineering drawings. (Downing Dep. at 34-35.)

**Plaintiffs' Response:**  Not disputed that Bertsch's engineering lists, customer, lists, correspondence folders, and engineering drawings were used by Park to continue the Bertsch business. (*See* Pl.'s Statement ¶¶ 17-18, 37-38).

45. Park referenced some of Bertsch's old plate bending roll machine engineering designs, but Park prepared its own engineering designs for purposes of the manufacture of machines. (4/26/1993 Cook Dep. at 29-30, 90-92; 9/21/1990 Cook Dep. at 11-12, 21.)

**Plaintiffs' Response:**  Disputed.  According to Bertsch's engineer of 41 years, Terry Smith, the design process for creating new Bertsch machines remained the same, including the same engineering drawings. (*See* Pl.'s Statement ¶¶ 37-38). Other than adding one employee (who was not designing Bertsch products) to the engineering department, there were no other changes in that department. (Ex. 4, Smith Dep. at 63). Defendant has submitted no Park engineering designs for Bertsch machines in support of its motion.

46. Park referenced some old Bertsch records, but it did not adopt Bertsch's customer list, instead preparing its own lists. (9/21/1990 Cook Dep. at 15-16; *see* Zabelsky Dep. at 49-50.)

**Plaintiffs' Response:**  Disputed.  The cited testimony only speaks to the old customer lists being contained on a computer that Park could not repair, such that Park used old Bertsch records to create new customer lists. (*See* Zabelsky Dep. at 49-50). Park continued to work with many of the same Bertsch customers. (*See* Ex. 5, Smith Aff. at 6; Pl.'s Statement ¶ 25-28, 33, 39).

47.          [sic] [no paragraph 47 in defendant's submissions]

29

48.    The Purchase Agreement did not require Park to retain any Bertsch employees. (5/11/1989 Zabelsky Dep. at 25-26; *see* Purchase Agreement.)

   **Plaintiffs' Response:**  Not disputed.

49.    Right after the asset purchase, Park only retained a few of the approximately one hundred individuals who Bertsch employed at the time of the transaction. (*See* Zabelsky Dep. at 43.)

   **Plaintiffs' Response:**  Disputed.  It is not clear how many employees were employed by Bertsch immediately prior to the transaction.  Terry Smith estimated that Bertsch may have employed approximately fifty employees prior to the transaction, in contrast to Zabelsky's testimony, and there is testimony that employees were continuously leaving Bertsch leading up to the transaction. (*See* Ex. 4, Smith Dep. at 55; Wonsetler Dep. at 13; Zabelsky Dep. at 25-26.). However, Mr. Smith also testified that there was a "wave" of employees leaving prior to the transaction as well.  (Ex. 4, Smith Dep. at 62).  What is clear is that the key employees who remained represented the key employees who managed the sales, service, and engineering division before and after the transaction, along with other longtime employees. (*See* Pl.'s Statement ¶¶ 42-45).

50.    The Bertsch employees hired by Park right after the asset purchase included Terry Smith ("Smith"), James Spurling ("Spurling"), and James Worl ("Worl"). (*See* March 30, 1993 Deposition of James H. Worl ("Worl Dep."), at 15, annexed as Exhibit P to Kitlowski Decl.; Smith Dep. at 7, 16.)

   **Plaintiffs' Response:**   Disputed as incomplete.  The Bertsch employees that remained after the transaction were Caroll Downing, manager of the Service Department, Gary Ventress and Deb Weilenman, managers of the sales department, Terry Smith and Mike Fink, managers of the engineering department, and former longtime Bertsch employees and shareholders including James Worl and Norm Bond, (Ex. 5, Smith Aff. ¶ 8; *see* Pl.'s Statement ¶ 42-45).

51.    Immediately prior to Park's purchase of assets of Bertsch, Worl served as a products specialist for Bertsch, although after the purchase of assets, Park employed Worl for approximately three years in the sales department. (Worl Dep. at 14-16; 4/26/1993 Cook Dep. at 36-37.)

   **Plaintiffs' Response:** Disputed.  James Worl, who was also a Bertsch shareholder, oversaw and worked for the Sales Department prior to the transaction with Park, and continued to work in Sales following the transaction. (*See* Ex. 5, Smith Aff.¶ 8).  The cited testimony states that before the transaction Worl "was mainly involved in quoting and selling our machines," and that after the transaction he "quoted machines." (Worl Dep. at 14-15).

52.    Immediately prior to Park's purchase of assets of Bertsch, Wonsetler headed the

engineering department, and Bertsch employed Smith as a project engineer. After the transaction, Smith served as manager of the engineering department, employed as chief engineer. (Smith Dep. at 13-14, 45.)

**Plaintiffs' Response.**  Disputed.  Before the transaction with Park, the senior employees in the Bertsch engineering department were Robert Wonsetler, Terry Smith, and Mike Fink. (Ex. 4, Smith Dep. at 13-14; Pl.'s Statement ¶ 42). Following the Park transaction, Terry Smith and Mike Fink continued to manage the engineering department out of Cambridge City. (Ex. 5, Smith Aff. ¶ 8; Pl.'s Statement ¶ 42). Sometime in the late 1980s, Smith became head of Engineering. (Ex. 4, Smith Dep. at 13-14).

53.   Immediately prior to Park's purchase of assets of Bertsch, Bertsch employed Spurling in its manufacturing department.  After the transaction, the manufacturing department was relocated to West Homestead, although Spurling continued to work in Cambridge City. (Smith Dep. at 16.)

**Plaintiffs' Response:** Not disputed, except as to the characterization of the Park transaction as a "purchase of assets."

54.   Several individuals were listed as "Management and Personnel Available to Park Corporation" in the Purchase Agreement, but from the names of individuals on that list, Park only hired Smith and Worl and, as explained above, their positions and responsibilities at Park were different than their positions and responsibilities at Bertsch. (*See* Purchase Agreement, Exhibit B; Wonsetler Dep. at 33-34; 4/26/1993 Cook Dep. at 43-45.)

**Plaintiffs' Response:**  Disputed. Three of the four individuals listed as management available to Park remained: James Worl, Terry Smith, and Al Phenis. (Ex. 6, Park Answers to Interrogatories, No. 18).  Each continued with the same positions as before the transaction. (Ex. 5, Smith Aff. ¶ 8; Ex. 6, Park Answers to Interrogatories, No. 18; *see* Pl.'s Statement ¶¶ 42-45).

55.   Beginning in the early 1980s and continuing until Bertsch filed for bankruptcy, a number of employees left Bertsch. (*See* Wonsetler Dep. at 13; Zabelsky Dep. at 25-26.)

**Plaintiffs' Response:** Not disputed.

56.   Bertsch employed Carroll Downing ("Downing") in various capacities, including service manager, from 1968 until he left in 1984. (Downing Dep. at 15-19.)

**Plaintiffs' Response:**  Not disputed that Downing managed the Service Department both before Bertsch filed for bankruptcy and in the month following the bankruptcy order. (*See* Ex. 4, Smith Dep. at 15-16; Pl.'s Statement ¶ 29, 44).

57.    Park hired Downing as a sales manager in June 1985, approximately seven months after it entered into the Purchase Agreement with Bertsch. (Downing Dep. at 25-26, 35-36.)

**Plaintiffs' Response:**  *See* paragraph 56 *supra*.

58.    Hugh Nichols ("Nichols") worked for Bertsch from 1952 until 1982. (August 22, 2002 Deposition of Hugh Nichols ("Nichols Dep."), at 12-13, 34-35, annexed as Exhibit Q to Kitlowski Decl.)

**Plaintiffs' Response:**  Not disputed.

59.    After Park purchased assets, Park hired Nichols for a short period of time. (Nichols Dep. at 34-36.)

**Plaintiffs' Response:**  Disputed. Hugh Nichols returned to Bertsch in 1985 as a sales manager who "worked with reestablishing contact with the old Bertsch distributors." Nichols later returned to Bertsch in the Service Department from 1989 to 1994. (*See* Nichols Dep. at 35-36, Ex. Q to Kitlowski Dep.)

60.    In 2003, Mega Manufacturing, Inc., entered into an asset purchase agreement with Park to acquire from Park assets formerly owned by Bertsch. (Zabelsky Decl. ¶ 3; *see* Smith Dep. at 7.)

**Plaintiffs' Response:**  Not disputed, except to the characterization of acquiring "from Park assets formerly owned by Bertsch."

PLAINTIFFS,

By their attorneys,

SUGARMAN AND SUGARMAN, P.C.

Dated:  April 5, 2012

/s/Benjamin R. Zimmermann_____
W. Thomas Smith – BBO #470380
tsmith@sugarman.com
Benjamin R. Zimmermann - BBO#643920
bzimmermann@sugarman.com
Steven N. Zane – BBO# 682578
szane@sugarman.com
One Beacon Street, 13th Floor
Boston, Massachusetts 02108
617-542-1000

32

287864.1

<u>Certificate of Service</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on April 5, 2012.

Stanley Yorsz, Esq.
Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

Bradley J. Kitlowski, Esq.
Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410

David M. Rogers, Esq.
Campbell Campbell Edwards & Conroy, P.C.
One Constitution Plaza, 3rd Floor
Boston, MA 02129

<u>/s/ Benjamin R. Zimmermann</u>
Benjamin R. Zimmermann

287864.1