UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWIN DEJESUS and MARIA L.<br>CARTAGENA<br><br>                    Plaintiffs,<br><br>          v.<br><br>BERTSCH, INC. and PARK CORPORATION<br><br>                    Defendants. | CIVIL ACTION<br>NO. 11-11563-WGY |

MEMORANDUM AND ORDER

YOUNG, D.J.                                        October 16, 2012

I.   **INTRODUCTION**

This is a products liability case brought under a successor liability theory.  The main issue presented to this Court is whether the successor corporation, Park Corporation ("Park"), is liable for the torts of its predecessor, Bertsch, Inc. ("Bertsch"), under the de facto merger or "mere continuation" exceptions to the usual rules of successor liability.

Park argues that the de facto merger doctrine is inapplicable to the facts of this case because there was neither continuity of shareholders nor was there any other indicia of Bertsch shareholders' control after Park purchased Bertsch's assets.  Plaintiff Edwin DeJesus ("DeJesus") argues that continuity of shareholders is not a dispositive factor in the de

facto merger analysis.  Alternatively, DeJesus alleges that Park expressly or impliedly assumed Bertsch's liabilities.

### A.    Procedural Posture

DeJesus and his spouse, Maria L. Cartagena ("Cartagena"), filed an amended complaint in state court against Park as successor to Bertsch, alleging that DeJesus suffered serious personal injuries resulting from the dangerous and defective condition of a "roll-pinch" machine manufactured by Bertsch. First Am. Compl. ("Compl.") ¶¶ 5-6, ECF No. 1-1.  Cartagena's claims rest on a loss of consortium theory.  Compl. ¶ 29.  Park removed the case to this Court on September 6, 2011.  Notice Removal, ECF No. 1.  On March 15, 2012, Park filed a motion for summary judgment.  Def. Park Corp.'s Mot. Summ. J. Successor Liability, ECF No. 14; Def. Park Corp.'s Mem. Law Supp. Mot. Summ. J. Successor Liability ("Park's Mem."), ECF No. 15; Def. Park Corp.'s Statement Uncontested Material Facts ("Park's SOF"), ECF No. 17.  On April 5, 2012, DeJesus and Cartagena filed their opposition.  Pls.' Mem. Opp'n Park Corp.'s Mot. Summ. J. Issue Successor Liability ("DeJesus's Opp'n"), ECF No. 20; Pls.' Statement Contested Material Facts ("DeJesus's SOF"), ECF No. 21.[1]  On April 12, 2012, Park filed a reply.  Def. Park Corp.'s

---

[1] This document, DeJesus's SOF, contains both a Statement of Contested Material Facts submitted by DeJesus and Cartagena in sections I-X, which contain paragraphs 1-67, as well as Plaintiffs' Response to Defendant's Statement of Uncontested Material Facts in section XI, which contains paragraphs 1-60.  To

Reply Supp. Mot. Summ. J. Successor Liability ("Park's Reply"),
ECF No. 23.  On May 16, 2012, after hearing from the parties, the
Court took the matter under advisement.  Elec. Clerk's Notes, May
16, 2012.

   B.   Facts[2]

   DeJesus and Cartagena allege that DeJesus suffered serious
personal injuries resulting from the dangerous and defective
condition of a "roll-pinch" machine manufactured by Bertsch.
Compl. ¶¶ 5-6.

   The machine that injured DeJesus was a plate-bending roller,
serial number 8826, manufactured by Bertsch and sold to Cambridge
Corporation of Lowell, Massachusetts, in 1957, and subsequently
purchased by James Russell Engineering in 1962.  Park's SOF
¶¶ 1-3.

   Bertsch was a family-owned business until 1978, when Deem
International, Inc. purchased 80 percent of the shares of

---

signify paragraphs that appear in Plaintiffs' Response to
Defendant's Statement of Uncontested Material Facts, the section
number, XI, for this section will be used.  For example, to refer
to paragraph 22 in this response section, the citation will be:
DeJesus's SOF XI ¶ 22.

   [2] For purposes of this summary judgment motion, the factual
summary presented herein consists of undisputed facts and
disputed facts construed in the light most favorable to DeJesus
and Cartagena, the non-moving parties.  The Court reviews the
record as a whole, but "it must disregard all evidence
unfavorable to the moving party that the jury is not required to
believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 151 (2000).

Bertsch.  Id. ¶¶ 4-5.  The remaining shareholders of Bertsch - James Worl, Robert Wonsetler, Norm Bond, and the Estate of John Worl - were descendants of the Bertsch family, and the three surviving descendants continued to work for Bertsch after the Deem acquisition.  DeJesus's SOF ¶ 3.  Prior to November 30, 1984, the date of the execution of an Asset Purchase Agreement, Park entered into negotiations to acquire Bertsch.  Park's SOF ¶ 11.  Park and Bertsch agreed to Bertsch's liquidation through a Bankruptcy Protection Plan and then proceed according to the terms of the Asset Purchase Agreement.  Id. ¶¶ 12, 15; see Decl. Benjamin R. Zimmermann, Esq. Supp. Pls.' Opp'n Park Corp.'s Mot. Summ. J. Successor Liability ("Zimmermann Decl."), Ex. 18, Asset Purchase Agreement ("Purchase Agreement") 4, ECF No. 22-18. Bertsch ceased operations as of May 3, 1985.  DeJesus's SOF XI ¶ 22.  As part of the Purchase Agreement, Park acquired Bertsch's engineering, engineering drawings, patents, copyrights, licenses, know-how, the trade name "Bertsch," trademarks, customer lists, addresses and contact persons.  DeJesus's SOF ¶ 17; Purchase Agreement 1-2.  With respect to liabilities, the Purchase Agreement states that Park is not "undertaking the assumption of any of the liabilities of Seller."  DeJesus's SOF XI ¶ 23; Purchase Agreement 3.

No ownership interests or stock were exchanged in the transaction between Bertsch and Park.  DeJesus's SOF XI ¶ 20; see

4

Purchase Agreement.  None of the directors or officers of Bertsch became directors or officers of Park.  DeJesus's SOF XI ¶ 21. Instead, two of three living Bertsch family shareholders at the time of the transaction, James Worl and Norm Bond, were employed by Park post-transaction.  Id. ¶¶ 50, 51.  The third living Bertsch family shareholder at the time of the transaction was Robert Wonsetler, who left his job as a head of the engineering department after the transaction.  Id. ¶ 52.

Park retained some of the long-time employees who managed the sales, services, and engineering divisions after the transaction.  Id. ¶ 49.  Among the employees who stayed after the transaction are: Terry Smith and Mike Fink, senior employees at Bertsch's engineering department, id. ¶ 50; Gary Ventress and Deb Weilenman, Sales Department managers, id.; and Carroll Downing, Service Department manager, id. ¶ 56.

After the transaction, Park held itself out to customers as Bertsch in its written advertisements, noting that Bertsch now is "a division of Park Corporation."  DeJesus's SOF ¶¶ 25-28.  The Bertsch phone number stayed the same and employees continued to answer incoming phone calls with the phrase "Thank you for calling Bertsch."  Id. ¶ 39.  The products offered by Bertsch and the process for creating them also remained the same.  Id. ¶¶ 37-38.  Both before and after the transaction, Park assumed Bertsch's liabilities under backlogged purchase orders and was

5

"in the process of starting to manufacture most of [Bertsch's] current machines in backlog," even before the date of the Purchase Agreement.  Id. ¶ 59 (citing Zimmermann Decl., Ex. 3, Nov. 21, 1984, Letter 3, ECF No. 22-3).  Immediately after the bankruptcy order, Park asked that purchase orders, initially made to Bertsch, be reissued to Park and that outstanding invoices be resubmitted to Park.  Id. ¶¶ 60-61.  Exclusive distributor contracts for Bertsch dealers and "the Park Corporation, doing business as Bertsch" were also renewed, and Bertsch's terms with vendors like UPS and FedEx were "reset" and assumed by Park.  Id. ¶¶ 62, 63-64.  In 2003, Mega Manufacturing, Inc., entered into an asset purchase agreement with Park to acquire from Park assets formerly owned by Bertsch.  DeJesus's SOF XI ¶ 60.

### C.   Federal Jurisdiction

Jurisdiction is proper under 28 U.S.C. § 1332.  There is diversity among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## II.  ANALYSIS

### A.   Legal Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" when it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  A dispute of fact is "genuine" if "the evidence
is such that a reasonable jury could return a verdict for the
non-moving party."  <u>Id.</u>  The moving party bears the burden of
showing that no genuine issue of material fact exists.  <u>Celotex
Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986).  The court must
construe the evidence "in the light most favorable to the
non-moving party, and draw[] all reasonable inferences in its
favor."  <u>Anderson</u>, 477 U.S. at 255.  "[A]lthough the court should
review the record as a whole, it must disregard all evidence
favorable to the moving party that the jury is not required to
believe."  <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S.
133, 151 (2000) (citing 9A C. Wright & A. Miller, <u>Federal
Practice and Procedure</u> § 2529, at 299 (2d ed. 1995)).

    **B.   Successor Liability**

        **1.   Massachusetts Law Adheres to the Traditional Rules
            of Successor Liability**

        When one corporation purchases another corporation
    (or substantially all of another corporation's assets),
    the doctrine of successor liability determines the
    distribution of tort liability.  Current doctrine often
    protects the successor corporation from liability for the
    predecessor's torts, even when the predecessor is
    unavailable for suit. . . .

            . . . .

        It would be unreasonable to attach successor
    liability to each individual asset sold, such that the
    sale of a single piece of equipment would carry with it
    some portion of the predecessor's tort liability.  But in
    situations where a successor purchases a significant
    portion of the predecessor's assets as a going concern,

shielding the successor from liability will undermine deterrence by allowing predecessors to evade liability through asset transfers.  The traditional version of successor liability allows this evasion to occur.

Note, <u>Successor Liability, Mass Tort, and Mandatory-Litigation Class Action</u>, 118 Harv. L. Rev. 2357, 2358-59 (2005) (footnotes omitted) (citations omitted).

Under the traditional rule of successor liability, the successor corporation is not liable for the predecessor's torts. Restatement (Third) of Torts: Products Liability § 12 (1997). The law, however, seeks to prevent "the owners of the selling corporation [from] avoid[ing] paying creditors without losing control of their business." <u>National Gypsum Co.</u> v. <u>Cont'l Brands Corp.</u>, 895 F. Supp. 328, 337-38 (D. Mass. 1995) (Gertner, J.). To avoid this result, there are four exceptions to the traditional rule:

> (1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations.

<u>Dayton</u> v. <u>Peck, Stow & Wilcox Co.</u>, 739 F.2d 690, 692 (1st Cir. 1984) (citations omitted) (applying Massachusetts law).

Some jurisdictions have adopted two other exceptions, which constitute more expansive models of successor liability; namely, the "product line" and the "continuity of enterprise" approaches.

8

See <u>Santa Maria</u> v. <u>Owens-Illinois, Inc.</u>, 808 F.2d 848, 857 (1st
Cir. 1986) (citing <u>Ray</u> v. <u>Alad Corp.</u>, 19 Cal. 3d 22 (1977)
(discussing product line exception) and <u>Turner</u> v. <u>Bituminous Cas.
Co.</u>, 397 Mich. 406 (1976) (discussing continuity of enterprise
exception) (applying New York law)).

The "product line" exception has been expressly rejected by
the Massachusetts Supreme Judicial Court, <u>Guzman</u> v. <u>MRM/Elgin</u>,
409 Mass. 563, 567 (1991), and the First Circuit, <u>Dayton</u>, 739
F.2d at 694.[3]  The "continuity of enterprise" exception
constitutes a broader view of the traditional "mere continuation"
exception.[4]  The main difference between these two exceptions is

---

[3] The "product line" exception extends liability to
successor corporations when the successor continues manufacturing
or marketing the same product line sold by the predecessor.  <u>Ray</u>,
19 Cal. 3d at 34 ("[A] party which acquires a manufacturing
business and continues the output of its line of products . . .
assumes strict tort liability for defects in units of the same
product line previously manufactured and distributed by the
entity from which the business was acquired.").

[4] Under "continuity of enterprise," a court will hold the
successor liable if the successor is sufficiently similar to the
predecessor that it is in essence continuing the predecessor's
enterprise.  <u>Turner</u>, 397 Mich. at 426, 429-30. ("[I]t does not
make sense or promote justice to require a merger and a de facto
merger to respond to products liability suits, and then to leave
a transfer of assets for cash free from suit, when the needs and
objectives of both the injured party and the corporation are the
same in all three instances."  <u>Id.</u> at 429-30.).  "The continuity
of enterprise analysis considers four factors: (1) continuity of
management, personnel, physical location, and assets; (2)
dissolution of the predecessor; (3) assumption of the ordinary
business obligations and liabilities by the successor; and (4)
the successor's presentation of itself as the continuation of the
predecessor." 15 William Meade Fletcher et al., <u>Fletcher</u>

that the "[c]ontinuity of enterprise analysis does not require
that the predecessor and successor corporations have <u>common
shareholders</u>."  <u>McCarthy</u> v. <u>Litton Indus., Inc.</u>, 410 Mass. 15, 22
(1991) (emphasis added) (citations omitted); <u>id.</u> at 23
(reaffirming that "the indices of a '[mere] continuation' are, at
a minimum: continuity of directors, officers, <u>and stockholders</u>;
and the continued existence of only one corporation after the
sale of assets" (emphasis added)).  The Massachusetts Supreme
Judicial Court has noted that the "continuity of enterprise"
exception remains a minority approach.  <u>Id.</u> at 23 n.6.
Similarly, after a detailed analysis of the different approaches
to successor liability, Judge Gertner declined to follow the
"mere continuation" exception and instead followed Massachusetts
law on "the traditional de facto merger or continuation analysis,
with its keystones of continuous ownership and inequitable
conduct."  <u>National Gypsum Co.</u>, 895 F. Supp. at 340 (citing
<u>Dayton</u>, 739 F.2d at 693 (agreeing that "'continuity of
shareholders' is a 'key factor.'")).

DeJesus and Cartagena do not allege that the Bertsch-Park
transaction was fraudulent; therefore, this Court only addresses
the other three exceptions.  Because the <u>de facto</u> merger and
"mere continuation" exceptions are so closely related, they will

---

<u>Cyclopedia of the Law of Private Corporations</u> § 7123.06, at 275
(perm. ed., rev. vol. 1990).

be analyzed together.  National Gypsum Co., 895 F. Supp. at 336

("While these two labels have been enshrined separately in the

canonical list of exceptions to the general rule of no successor

liability, they appear, in practice to refer to the same concept

. . . and courts have often used the two terms interchangeably."

(citation omitted)).

DeJesus and Cartagena point out that this is not the first

time that Park has been held liable for Bertsch's defective

products under a successor liability theory.  DeJesus's Opp'n 1

n.1; see Sweatland v. Park Corp., 181 A.D.2d 243 (N.Y. App. Div.

1992) (denying Park's motion for summary judgment on the issue of

successor liability); Cutillo v. Park Corp., 185 A.D.2d 641 (N.Y.

App. Div. 1992) (issuing a unanimous order without opinion and

citing Sweatland); Middleton v. Park Corp., No. 99-CV-2206

(N.D.N.Y. Feb. 14, 2003) (same).

These cases all rely on the traditional exceptions to

successor liability.[5]  Sweatland, 181 A.D.2d at 247 (declining to

_____

[5] DeJesus and Cartagena also reference some Pennsylvania
cases applying the "product line" exception which are not
concordant with Massachusetts law.  DeJesus's Opp'n 12 n.15; see
Dillman v. Ind. Rolls, 67 Pa. D. & C. 4th 294, 300 (Ct. Com. Pl.
2004) (holding that Park continued the same product line as
Bertsch and "sought to capitalize on Bertsch's name, reputation,
and good will, and to convey to the general public the impression
that Bertsch and Company was an ongoing business enterprise as a
division of Park Corporation"); see also Rhodes v. C.M. Wood
Mach., Inc., No. 3:CV-91-1601 (M.D. Pa. Apr. 5, 1994); Seeley v.
Park Corp., No. 90-5625, 1991 U.S. Dist. LEXIS 4692 (E.D. Pa.
Apr. 8, 1991).

address the "product line" and the "continuity of enterprise"
exceptions).  The Sweatland court held that there were sufficient
issues of material fact regarding whether the transaction between
Bertsch and Park constituted a de facto merger to warrant further
discovery.  Id. at 245-46.  Sweatland did not specifically
address the alleged Bertsch-Park continuous ownership; however,
the court noted that "[n]ot all of [the] factors are needed to
demonstrate a merger; rather, [the] factors are only indicators
that tend to show a de facto merger."  Id. at 246 (first
alteration in original) (quoting Menacho v. Adamson United Co.,
420 F. Supp. 128, 133 (D.N.J. 1976) (internal quotation marks
omitted).

When the Second Circuit addressed this issue, it held that
the Sweatland holding was not an authoritative statement of New
York law.  New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201,
213-14 (2nd Cir. 2006).  Reviewing the application of the
traditional rules of successor liability in the New York cases,
it found no support for the argument that a de facto merger could
exist in the absence of continuity of ownership.  Id.

### 2.  The De Facto Merger and "Mere Continuation" Exceptions under Massachusetts Law

Massachusetts courts consider the following factors in
determining whether to characterize a purported sale of assets as
a de facto merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 712 F. Supp. 1010, 1015 (D. Mass. 1989) (citations omitted).

Except for the "continuity of shareholders" factor, Park does not dispute the existence of these factors here.  Park's Mem. 12-13.  Indeed, DeJesus and Cartagena have a very well-developed case as to the other three factors.

The first factor is satisfied.  DeJesus and Cartagena produced evidence to support a finding that Park continued Bertsch's enterprise, so that Park retained many employees who managed the sales, services, and engineering divisions after the transaction, including senior employees and two former shareholders.  DeJesus's SOF XI ¶¶ 49-52.  The products offered

by Bertsch also remained the same.  DeJesus's SOF ¶¶ 37-38.  Park continued using Bertsch's engineering, engineering drawings, the trade name "Bertsch," customer lists, addresses, and contacts persons.  Id. ¶¶ 17, 25-28.  The Bertsch phone number stayed the same and employees continued to answer incoming phone calls with the phrase "Thank you for calling Bertsch."  Id. ¶ 39.

The third factor is also satisfied.  DeJesus and Cartagena's evidence also supports that Park assumed all Bertsch operations and liquidated its assets as soon as legally and practically possible through a bankruptcy proceeding.  Id. ¶¶ 23-24.

The fourth factor is also satisfied because Park assumed those obligations of Bertsch ordinarily necessary for the uninterrupted continuation of normal business operations, i.e., Park assumed Bertsch's liabilities under backlogged purchase orders, id. ¶ 59, asked that purchase orders to Bertsch be reissued to Park and that outstanding invoices be resubmitted to Park, id. ¶¶ 60-61, and renewed distributor contracts, id. ¶ 62, and Bertsch's terms with vendors like UPS and FedEx were "reset" and assumed by Park, id. ¶¶ 63-64.

As to the "continuity of shareholders" factor, Park argues that the de facto merger doctrine is inapplicable to the facts of this case because there was no continuity of shareholders or any other indicia of Bertsch shareholders' control after Park purchased the assets.  Park's Mem. 13; Park's Reply 9 n.7.

DeJesus and Cartagena respond, arguing that the continuity of shareholders factor is not dispositive, although it is undisputed that Bertsch's shareholders did not retain any type of ownership or control over the business after the asset sale to Park.[6] DeJesus's Opp'n 13-17.   In other words, DeJesus does not dispute that "[a]ll individuals that held primary control over Bertsch did not possess any such control over the Bertsch Division of Park" or Park itself.   Park's Reply 11.   The Court agrees with Park that no de facto merger occurred.

Under Massachusetts law, a de facto merger does not occur absent a showing that there is a continuity of shareholders or other type of transaction that ultimately makes Bertsch's shareholders directly or indirectly constituent owners of Park, the purchasing corporation.   Goquen v. Textron Inc., 476 F. Supp. 2d 5 (D. Mass. 2007) (Saylor, J.).   This same conclusion is obtained under the "mere continuation" exception.   McCarthy, 410 Mass. at 23 (reaffirming that "the indices of a '[mere] continuation' are, at a minimum: continuity of directors,

---

[6] To Park's statement "No ownership interests were exchanged in the transaction between Bertsch and Park," DeJesus and Cartagena responded: "To the extent this refers to an exchange of stock, it is not disputed that there was no exchange of stock because Bertsch declared bankruptcy as a condition to the Agreement and its stock was by definition worthless."   DeJesus's SOF XI ¶ 20.   Then to Park's statement "None of the directors or officers of Bertsch became directors or officers of Park," DeJesus and Cartagena responded: "Not disputed."   Id. at ¶ 21.

officers, <u>and stockholders</u>; and the continued existence of only one corporation after the sale of assets" (emphasis added)).

The successor liability doctrine is an equitable doctrine, and the Court considers whether the shareholders used a disguised mechanism to transfer the legal ownership of the corporation but ultimately retain the same effective control.  This is the approach this Court used in <u>Acushnet</u>, 712 F. Supp. at 1016-17. In <u>Acushnet</u>, this Court held that the failure to show continuity of shareholders is not dispositive when the purchase was achieved through the use of a parent corporation's shares, obtaining virtually the same control.  <u>Id.</u>  Other courts have arrived at similar conclusions.  <u>See, e.g.</u>, <u>Ed Peters Jewelry Co., Inc.</u> v. <u>C & J Jewelry Co., Inc.</u>, 124 F.3d 252, 273-74 (1st Cir. 1997) (applying Rhode Island law and concluding "that [successor defendant] used the family trust to camouflage his ultimate retention of control over the [purchased company's] manufacturing business which C & J continued to conduct, without interruption"); <u>National Gypsum</u>, 895 F. Supp. at 337 ("The intended result in all cases is the same, to permit the owners of the selling corporation to avoid paying creditors <u>without losing control</u> of their business." (emphasis added)); <u>Park</u> v. <u>Townson & Alexander, Inc.</u>, 287 Ill. App. 3d 772, 775 (1997) ("[W]hile the spousal relationship between the owners of the corporations does

16

not in itself establish a continuity of shareholders, it is certainly a factor which can be considered.").

Under the traditional approach to <u>de facto</u> merger, the seller must retain some type of ownership or control over the purchasing company; thus, the First Circuit (applying Virginia law) reasoned that the continuation of ownership is a broader concept than mere continuation of shareholders. <u>Devine & Devine Food Brokers, Inc.</u> v. <u>Wampler Foods, Inc.</u>, 313 F.3d 616, 619 (1st Cir. 2002) ("While not dispositive, the factor that typically tips the scales in favor of finding a merger is continuity of ownership, usually taking the form of an exchange of stock for assets."); <u>Ed Peters Jewelry Co., Inc.</u>, 124 F.3d at 273-74 ("We note that the continuity of shareholders necessary to a finding of mere continuation does not require complete identity between the shareholders of the former and successor corporations." (quoting <u>Park</u>, 287 Ill. App. 3d at 775) (internal quotation marks omitted)).  Continuity of shareholders may occur even if there is no complete shareholder identity between the seller and the buyer.  <u>Cargill, Inc.</u> v. <u>Beaver Coal & Oil Co.</u>, 424 Mass. 356, 361 (1997) (noting that there is "no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach" and holding that a 12.5 percent voting interest was sufficient to attach successor liability because the sale left the owner of the

17

predecessor entity with a seat on the successor corporation's
board of directors and the largest personal holding of shares of
stock).

In the same vein, even when there is continuity of
shareholders, the shareholder continuity factor is not
dispositive when the transfer of stock does not result in
ownership or control.  Devine & Devine, 313 F.3d at 619 (applying
Virginia law and holding that a 10 percent interest composed of
voting stock did not suffice to impose successor liability under
a de facto merger theory because there was neither "wholesale
continuity of management or ownership nor a liquidation of the
selling corporation"); American Paper Recycling Corp. v. IHC
Corp., 707 F. Supp. 2d 114, 121 (D. Mass. 2010) (Stearns, J.)
(holding that under Massachusetts law, acquisition of less than
3.2 percent of buyer corporation's stock in consideration for
seller corporation's assets was not sufficient to impose
successor liability when seller "has no voting rights, cannot
transfer its shares, and holds the shares subject to a right of
unilateral redemption," and when none of seller's directors or
officers hold a position in buyer's company).

Ultimately, DeJesus and Cartagena's arguments are very
similar to those raised in Goquen, 476 F. Supp. 2d at 7.  There,
the administrator of a worker's estate filed a state court
products liability action after the worker was killed in an

18

industrial accident while operating a milling machine.  Id.  The

Court in Goguen held that:

> Plaintiff also points to the dicta in Cargill that
> "no single factor is necessary . . . to establish a de
> facto merger," and argues that shareholder continuity is
> therefore merely a factor to be considered, not a
> prerequisite to be satisfied.  While the Court
> acknowledges the breadth of the Cargill dicta, it also
> observes that no case has ever gone so far as to dispense
> with the "shareholder continuity" factor altogether.
> Furthermore, eliminating the requirement altogether would
> produce a result almost indistinguishable from the
> "continuity of enterprise" theory – a controversial
> approach that has not been adopted in
> Massachusetts. . . .  The Court therefore concludes that,
> on the record evidence, there was no continuity of
> shareholders, and therefore plaintiff cannot establish
> that a de facto merger occurred . . .

Id. at 14 (footnote omitted) (citations omitted).

Here, DeJesus and Cartagena have not submitted any evidence

that there was a transfer of stock between Bertsch and Park.

Instead, DeJesus and Cartagena argue that the "continuation of

shareholders" factor is not dispositive, and because Bertsch was

insolvent in its bankruptcy petition, Bertsch's stock was

worthless.  DeJesus's Opp'n. 14-15.  DeJesus and Cartagena argue

further that to transfer "Bertsch shares would make no real

world, business sense."  Id.  This argument is unpersuasive and

does not suffice to show that there was a de facto merger.  On

the contrary, it undercuts DeJesus and Cartagena's argument

because the reasonable inference is that it made more business

sense for Park to transact a true asset sale than to acquire a

worthless company.  DeJesus and Cartagena's argument misses the

point; the whole purpose of a _de facto_ merger is to change the form of a coproration without changing its substance, i.e., continue the business and avoid the liabilities by defrauding the creditors.  Business sense is immaterial to this type of sham.

The question is _not_ whether Park continued Bertsch's enterprise as an ongoing business, which could be obtained by working with the assets, intellectual property, and facilities purchased; rather, the question is whether Bertsch's shareholders or parent company sought to remain in control of its business through a merger while avoiding any continued liability.  No evidence provided by DeJesus and Cartagena suggest that Bertsch remained in control or ownership of the company after Park's asset buy.  Therefore, as matter of law, DeJesus and Cartagena fail to demonstrate that there was a _de facto_ merger between Bertsch and Park or that Park merely continued Bertsch's business, so no successor liability attaches.

### 3.   Park Did Not Expressly or Impliedly Assume Bertsch's Liabilities

DeJesus and Cartagena argue that Park expressly or impliedly assumed Bertsch's liabilities, including product liability claims.  DeJesus's Opp'n 17-20.

Successor liability may attach when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability.  _Dayton_, 739 F.2d at 692 (applying Massachusetts law); _see_ _Motorsport Eng'g, Inc._ v. _Maserati_, 183

F. Supp. 2d 209, 219 (D. Mass. 2001) (Lasker, J.) ("[T]here must be a showing of intent by the purchasing company to assume the old corporation's liabilities in whole or in part in order to show an implied assumption.").

With respect to liabilities, the Purchase Agreement states at paragraph 1(c) that "Except as hereinafter expressly undertaken in paragraph 3 hereof, Buyer is not purchasing or undertaking the assumption of any of the liabilities of Seller."[7] Purchase Agreement 3.  Other courts analyzing this very same contract have held that "[t]he agreement specifically provided that defendant assumed liability only for claims regarding products shipped under the Bertsch name after the date of closing.  The plate-bending roller was shipped in 1954, over 30 years before the closing; thus, there is no implicit or express

_____

[7] The Purchase Agreement also provided in part:

[Bertsch] hereby agrees to indemnify, defend and save harmless [Park] from and against all of [Bertsch's] liabilities incurred prior to or after the date of closing and all product liability for personal injury whenever a claim may arise with respect to all products shipped on or prior to the date of closing.  [Park] specifically assumes and indemnifies [Bertsch] with respect to claims, if any, arising with respect to products shipped by [Park] under the Bertsch name after the date of closing.  [Park] is not assuming any liability or responsibility for damages, repairs, returned merchandise or any consequential damages which said customers may have sustained in connection with said product warranty claims.

Purchase Agreement 5.

assumption of liability." <u>Sweatland</u>, 181 A.D.2d at 245.  The same reasoning applies here.  The plate-bending roller that injured DeJesus was purchased in 1962, almost 20 years before the closing.  DeJesus's SOF XI ¶ 1.

DeJesus and Cartagena noted that the Purchase Agreement was not an integrated contract and that Park's conduct after the asset buy may indicate its intent to assume Bertsch's liabilities.  DeJesus's Opp'n 4, 8, 17-18.  After the bankruptcy order, Raymond Park, President of Park, signed and submitted a Novation Agreement to the United States government in which Park was recognized as a "[Bertsch's] successor in interest in and to the contracts" between Bertsch and the government.  Zimmermann Decl., Ex. 37, Novation Agreement 3, ECF No. 22-37.  The Novation Agreement stated that in the transfer of assets pursuant to the Purchase Agreement, Park had "assumed all obligations and liabilities of Bertsch and Company, Inc. under the contracts," had "acquired all the operating assets of Bertsch and Company, Inc.," and was "in a position to fully perform all obligations that may exist under the contracts."  Novation Agreement 2.  The "contracts" and the fact that Park is Bertsch's "successor to the contracts" were not mentioned in the asset Purchase Agreement.  <u>See</u> Purchase Agreement.

Park argues that this Novation Agreement was only a "proposed Novation Agreement" and that the government never

executed it.  Park's Reply 13.  Whether it was ever signed by the government is inconsequential because DeJesus and Cartagena need only show that Park had the intent to assume Bertsch's tort liabilities beyond the Purchase Agreement.

Park then contends that "[e]ven if Park assumed liability for Bertsch's contractual obligations under the contracts Bertsch had with the United States government or others, there is no evidence Park assumed liability for tort claims like those raised by Plaintiffs here."  Id.  This argument is not clear cut.

Drawing all reasonable inferences in favor of DeJesus and Cartagena, the "Novation Contract" and those "other" contracts not mentioned in the Purchase Agreement imply that Park intended to assume some liabilities, but they are expressly limited to those "liabilities . . . under the contracts."  Novation Agreement 2.  DeJesus and Cartagena have the burden of showing that Park impliedly assumed tort liability as opposed to contract liabilities for these "other" contracts.  No such showing exists on this record.

Therefore, there is no evidence that Park intended to assume Bertsch's tort liabilities.

**III.     CONCLUSION**

For these reasons, this Court ALLOWS Park's motion for summary judgment, ECF No. 14, and a judgment of dismissal shall be entered.

**SO ORDERED.**

           /s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE